UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 12-31159 (JAM) |
| | ) | | |
| VINCENT J. CARRANO, | ) | CHAPTER | 13 |
| | ) | | |
| DEBTOR. | ) | | |
| | | | |
| 3N INTERNATIONAL, INC., | ) | ADV. PRO. NO. | 13-03008 (JAM) |
| | ) | | |
| PLAINTIFF, | ) | ECF NO. | 1 |
| | ) | | |
| v. | ) | | |
| | ) | | |
| VINCENT J. CARRANO | ) | | |
| | ) | | |
| DEFENDANT. | ) | | |

**APPEARANCES**

Barbara H. Katz, Esq.                           Attorney for the Plaintiff
57 Trumbull Street
New Haven, CT 06510

Neil Crane, Esq.                                Attorneys for the Defendant
James Heffernan, Esq.
Stuart Kaplan, Esq.
Law Offices of Neil Crane, LLC
2679 Whitney Avenue
Hamden, CT 06518

**MEMORANDUM OF DECISION**

Julie A. Manning, Chief United States Bankruptcy Judge

## I.    INTRODUCTION

Before the Court is the six-count Complaint of 3N International, Inc. ("3N"), in

connection with an overpayment it made to VJC Logistics, LLC, a company owned by Vincent J.

Carrano ("Carrano").  Counts One, Two, and Three of the Complaint allege that Carrano is

personally liable under state law causes of action for failing to return the overpayment to 3N.

Counts Four, Five, and Six of the Complaint allege that if Carrano is personally liable for failing

to return the overpayment, the debt to 3N should be deemed nondischargeable pursuant to 11

U.S.C. §§ 523 (a)(2)(A), (a)(4) and/or (a)(6).

Following trial, on July 17, 2014, the parties submitted their respective Proposed

Findings of Fact and Conclusions of Law for the Court's consideration.  For the reasons that

follow, judgment will enter in favor of 3N on Counts One, Two, Three, Five, and Six of the

Complaint and judgment will enter in favor of Carrano on Count Four of the Complaint.

## II.    JURISDICTION

The United States District Court for the District of Connecticut (the "District Court"), has

jurisdiction over this matter pursuant to 28 U.S.C. §1334(b).  The Bankruptcy Court derives its

authority to hear and determine this matter pursuant to 28 U.S.C. §157(a) and the Order of

Reference of the District Court dated September 21, 1984.  Although the Complaint does not

allege that the proceeding is core or non-core as required by Fed. R. Bankr. P. 7008, this matter

is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A) and (b)(2)(I).

The recent decisions of the United States Supreme Court in *Stern v. Marshall*, 131 S. Ct.

2594, 180 L. Ed. 2d 475 (2011), and *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 189

L. Ed. 2d 83 (2014), have cast doubt on the constitutional authority of a bankruptcy court to enter

a final judgment in some statutorily "core" proceedings.  However, the claims in this

dischargeability action are not *Stern* claims.  28 U.S.C. § 157(b)(2)(I); *Deitz v. Ford (In re

Deitz)*, 760 F. 3d 1038, 1044 (9th Cir. 2014) (noting that "*Stern* is a narrow decision," rejecting

*Stern*'s applicability to dischargeability proceedings and characterizing dischargeability as a

"prototypical bankruptcy" matter); *Trinity Christian Ctr. Of Santa Ana, Inc. v. Koper (In re*

*Koper)*, 516 B.R. 707, 719 (Bankr. E.D.N.Y. 2014); *Hyundai-Wai Mach. Am. Corp. v. Rouette (In re Rouette)*, 500 B.R. 670 (Bankr. D. Conn. 2013).

In dischargeability actions decided after *Stern*, several courts have noted, "the issues of liability . . . and dischargeability are so intertwined that . . . a separation of issues in the context of Section 523(a)(2), (4), and (6) of the Bankruptcy Code" is not feasible. *In re Koper*, 516 B.R. at 721; *see also, In re Rouette*, 500 B.R. 670, 676 (Bankr. D. Conn. 2013); *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 311-12 (Bankr. N.D. Tex. 2011) *aff'd sub nom. Carroll v. Farooqi*, 486 B.R. 718 (N.D. Tex. 2013). Based upon this Court's interpretation of *Stern* and the case law in dischargeability actions decided after *Stern*, this Court concludes that it has both the constitutional and statutory authority to enter a final judgment on all counts of the Complaint.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The factual circumstances in this adversary proceeding are unfortunate. The controversy regarding the overpayment was caused by the actions of all of the parties – 3N, VJC, and Carrano – and no party is without fault.

After analyzing and reviewing the evidence introduced at trial, the following are the Court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

### A. Findings of Fact

### 3N and Carrano

1. Carrano lived in and operated several businesses in Connecticut. (Complaint at ¶2; Testimony of Carrano at May 19, 2014 trial; Defendant's Exhibit 1).

2.     In 2002, Carrano formed and became the sole owner of VJC Logistics, LLC ("VJC"), a storage, transportation, and distribution service provider. (Defendant's Exhibit 1; Testimony of Carrano at May 19, 2014 trial).

3.     In addition to VJC, Carrano also owned: (i) VJC Warehouse and Distribution, Inc. ("VJC Warehouse"); (ii) Carrano Transportation and Logistics LLC ("Carrano Transportation LLC"); and (iii) Carrano Transportation and Logistics, Inc. ("Carrano Transportation Inc.") (collectively, the "Carrano entities").

4.     3N was founded in 1995 in Akron, Ohio, and is in the business of importing and distributing industrial materials.   David Li ("Li"), and his wife, Cindy Chen, are both fifty percent (50%) owners of 3N. (Complaint at ¶1; Testimony of Li at May 19, 2014 trial).

5.     For more than five years, from May 2005 to December 2010, 3N leased storage space from VJC. 3N used the space to store materials for its clients located in Connecticut. (Testimony of Li at May 19, 2014 trial).

### The overpayment, VJC business practices, and the VJC bank accounts

6.     On July 1, 2010, 3N received a monthly rental invoice from VJC in the amount of $81.95 (the "Invoice"). (Plaintiff's Exhibit A, Testimony of Li at May 19, 2014 trial).

7.     On July 6, 2010, VJC received a check from 3N in the amount of $81,095.00 for payment of the Invoice. (Testimony of Li at May 19, 2014 trial, and Plaintiff's Exhibit B).

8.     Instead of issuing a check to VJC in the amount of $81.95 to pay the Invoice, 3N mistakenly issued a check to VJC in the amount of $81,095.00 (the "overpayment"). (Testimony of Li at May 19, 2014 trial).

9.      On July 9, 2013, VJC deposited the overpayment into its Bank of America, N.A. checking account (the "VJC Checking Account"). (Plaintiff's Exhibit B; Defendant's Exhibit 3).

10.     Up to five different VJC employees had the authority to deposit checks into the VJC Checking Account. (Testimony of Carrano at May 19, 2014 trial).

11.     VJC did not match incoming payments against invoices. All payments received were retrieved from VJC's mailbox by any one of a number of VJC employees. The checks were then endorsed with a stamp and deposited into the VJC Checking Account. (Testimony of Carrano at May 19, 2014 trial).

12.     At the time the overpayment was made, Carrano was in the VJC offices only two or three days a week due to personal issues he was facing, including a divorce and custody dispute. (Testimony of Carrano at May 19, 2014 trial).

13.     Carrano admitted that he failed to pay attention to the operations of VJC at the time the overpayment was made. Carrano also admitted that he did not properly supervise his employees who handled the receipt and deposit of funds, and that entrusting his employees with such a responsibility was a mistake. (Testimony of Carrano at May 19, 2014 trial).

14.     VJC employees had access to the VJC's bank account through VJC's online banking system. The online banking system information was readily available to VJC employees and was often unattended, enabling any VJC employee to transfer money among the VJC bank accounts or any other accounts linked to the VJC accounts. Funds moved between and among the Carrano entities to allow each entity to have sufficient funds to cover its business

expenses. (Plaintiff's Exhibit A, Plaintiff's Exhibit E; Plaintiff's Exhibit J; Testimony of

Carrano at May 19, 2014 trial).

15.     On July 16, 2010, VJC opened a Business Interest Maximizer

Savings Account (the "VJC Savings Account"), and transferred $81,000.00 from the VJC

Checking Account into the VJC Savings Account. (Testimony of Carrano at May 19, 2014 trial).

16.     The VJC Savings Account was inactive from July 16, 2010, until the

middle of September, 2010. (Testimony of Carrano at May 19, 2014 trial).

17.     From September 10, 2010, through September 17, 2010, three transfers

totaling $23,545.27 were made from the VJC Savings Account into the VJC Checking Account.

(Testimony of Carrano at May 19, 2014 trial).

18.     In October 2010, $14,500.00 was transferred from the VJC Savings

Account into the VJC Checking Account to cover business expenses for VJC.  Also in October

2010, two wire transfers totaling $40,000.00 were made from the VJC Savings Account to

purchase two Ryder Trucks to be used by Carrano Transportation LLC. (Testimony of Carrano

at May 19, 2014 trial; Plaintiff's Exhibit L; Defendant's Exhibit 3).

19.     By November 2010, all of the funds in the VJC Savings Account had been

withdrawn from or transferred out of the account. (Testimony of Carrano at May 19, 2014 trial).

### 3N's Discovery of the Overpayment and related events

20.     On February 17, 2011, more than seven months after VJC received the

overpayment from 3N, Li discovered that the overpayment had been made.  Li admitted that

3N's failure to reconcile checks issued to third parties for several months after the checks were

issued was not a good business practice. (Testimony of Li at May 19, 2014 trial).

21.    Upon discovery of the overpayment, Li immediately attempted to contact VJC. He also faxed and emailed a letter to VJC demanding the return of $81,013.05, which he calculated to be the amount of the overpayment. (Plaintiff's Exhibit C, Testimony of Li at May 19, 2014 trial).

22.    On February 23, 2011, funds in the amount of $43,000.00[1] were deposited into the Carrano Transportation LLC Payroll Account (the "Carrano Transportation LLC Account"). The $43,000.00 deposited into the Carrano Transportation LLC Account was a refund of the wire-transfer from the VJC Savings Account for the purchase of two Ryder Trucks for use by Carrano Transportation LLC. The $43,000.00 refund was used to pay ongoing business expenses of the Carrano entities. (Testimony of Carrano at May 19, 2014 trial; Plaintiff's Exhibit J).

23.    On March 1, 2011, Carrano emailed Li and admitted that VJC had received the overpayment. Carrano offered to have VJC return the overpayment by providing future services to 3N and paying 3N at least $1,000.00 per month. (Plaintiff's Exhibit C; Defendant's Exhibit 8).

24.    In an email dated March 3, 2011, Carrano again offered to have VJC return the overpayment by providing future services to 3N and making monthly installment payments to 3N. (Plaintiff's Exhibit C).

25.    Before 3N made the overpayment to VJC, Mr. Burvee Franz ("Franz") had business dealings with both VJC and 3N. Franz recommended to 3N that it lease space at VJC's warehouse to store its materials. (Testimony of Franz at May 19, 2014 trial).

---

[1] There is an inconsistency between the $43,000.00 referenced in paragraph 22 and the $40,000.00 referenced in paragraph 18, but such inconsistency is immaterial and reflects the evidence presented at trial.

26.     On March 3, 2011, Franz discussed the overpayment with Li. Following the conversation with Li, Franz went to VJC's offices and spoke with Carrano. Franz testified that Carrano told him that "he held on to the money for as long as he could, but if he hadn't spent it when he did, the business would be out of business." (Testimony of Franz at May 19, 2014 trial).

27.     In an email dated March 11, 2011, VJC again offered to repay 3N and admitted that it did not have "the money sitting in the bank." (Plaintiff's Exhibit C).

28.     On March 21, 2011, 3N rejected all of VJC's proposals. 3N instead demanded that on or before March 25, 2011, VJC make payment in full to 3N of the overpayment, plus accrued interest, in the total amount of $86,695.06. (Plaintiff's Exhibit C).

### The State Court Action

29.     On December 22, 2011, 3N filed a complaint in the Connecticut Superior Court against Carrano and the Carrano entities (the "State Court Action"). (Plaintiff's Exhibit E).

30.     On January 26, 2012, all of the Carrano entities were defaulted for failing to appear. Carrano filed a pro se appearance and therefore a default was not entered against him. (Plaintiff's Exhibit E).

31.     On May 16, 2012, Carrano filed his Chapter 13 case in this Court.

32.     On August 3, 2012, a Memorandum of Decision was issued in the State Court Action in which a default judgment was entered against the Carrano entities. The Connecticut Superior Court held that the Carrano entities "… cashed [3N's overpayment] check . . . and thereafter appropriated the overage amount for its [sic] own use. Upon discovery of this

mistake, [3N] demanded return of the overpayment amount . . . from the defendants and the defendants failed to return the overpayment." (Plaintiff's Exhibit E).

33.    The Connecticut Superior Court further held that "the egregious nature of the defendant's [sic] conduct . . . are sufficient to support [3N's] claim for treble damages [for statutory theft pursuant to Conn. Gen. Stat. § 52-564,] in the amount of $243,039.15. (Plaintiff's Exhibit E).

34.    The Court also held the Carrano entities liable for punitive damages in the amount of $80,000.00, due to the defendants' "egregious conduct as demonstrated by the plaintiff's allegations [which] constitute an unfair act in the course of trade carried out with the defendants' intentional and wanton violation of the plaintiff's rights." (Plaintiff's Exhibit E).

35.    On February 7, 2013, 3N commenced this adversary proceeding against Carrano.

## B.    Conclusions of Law

All of the counts of the Complaint are asserted against Carrano "individually" and "as member, shareholder, agent, employee, officer and/or person in charge of" VJC.  Under Connecticut law,

> 'a limited liability company member cannot be held liable for the malfeasance of a limited liability company by virtue of his membership in the limited liability company alone; in other words, he must do more than merely be a member in order to be liable personally for an obligation of the limited liability company.  The statute [Conn. Gen. Stat. § 34-133(a)] thus does not preclude individual liability for members of a limited liability company if that liability is not based simply on the member's affiliation with the company.'

*Sturm v. Harb Dev., LLC*, 298 Conn. 124, 136-37, 2 A.3d 859, 869 (2010) (quoting *Weber v. U.S. Sterling Securities, Inc.*, 282 Conn. 722, 732, 924 A.2d 816 (2007)); *see also Lego A/S v. Best-Lock Const. Toys, Inc.*, 886 F. Supp. 2d 65, 77 (D. Conn. 2012).

In *Lego A/S v. Best-Lock Const. Toys, Inc.*, the District Court explained that "[c]orporations are venerable creatures of the law. They exist in order to facilitate limited investment in commercial enterprises while shielding an entrepreneur's personal wealth from the risk of paying for corporate indebtedness .... Connecticut law is to the same effect." *Id.* However, it is also true under Connecticut law that "an officer of a corporation who commits a tort is personally liable to the victim regardless of whether the corporation itself is liable." *Coppola Const. Co. v. Hoffman Enters. Ltd. P'ship*, 309 Conn. 342, 357, 71 A.3d 480 (2013).

With these principles in mind, the Court must first consider if Carrano should be held personally liable for failing to return the overpayment as alleged in Counts One, Two, and Three of the Complaint.

### 1.    Count One – Conversion & Statutory Theft

#### a.    Conversion

Count One alleges that Carrano failed to return the overpayment and that his actions and/or the actions of the Carrano entities in failing to return the overpayment constitute conversion under Connecticut law. 3N further alleges that Carrano is personally liable to 3N for damages as a result of the conversion.

To succeed on a claim of conversion under Connecticut law, a plaintiff must prove "an unauthorized assumption and exercise of the right to ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 418, 934 A.2d 227, 234 (2007); *accord, Chorches v. Ogden, (In re Bolin & Co., LLC)*, 437 B.R. 731, 752 (D. Conn. 2010); *Titan Real Estate Ventures, LLC v. M.J.C.C. Realty L.P (In re Flanagan)*, 348 B.R. 81, 90 (Bankr. D. Conn. 2006) *aff'd*, 415 B.R. 29 (D.

Conn. 2009).  The burden of proof in a conversion action is the preponderance of the evidence

standard.  *Epstein v. Automatic Enters.*, 6 Conn. App. 484, 489, 506 A.2d 158, 160 (1986).

In Connecticut, there are two classes of conversion claims.  The Connecticut Appellate

Court has described the two classes as follows:

> [t]he first class pertains to instances of tortious taking in that the possession is
> originally wrongful.  Because proof of the tortious act establishes the conversion,
> a demand for and refusal to return the property in question are unnecessary.  The
> second class is where the possession, originally rightful, becomes wrongful by
> reason thereafter of a wrongful detention, or a wrongful use of the property, or the
> exercise of an unauthorized dominion over the property. In the last two groups of
> this class, the wrongful use and the unauthorized dominion, constitute the
> conversion; therefore no demand for the return of the personal property is
> required. In the first group, since the possession is rightful and there is no act of
> conversion, there can be no conversion until the possessor refused to deliver up
> the property upon demand. Unexplained, the refusal is evidence from which a
> conversion may be found.

*Id.* at 488.

3N's claim falls into the second class of conversion claims.  3N asserts that Carrano

and/or the Carrano entities are liable for conversion because they wrongfully detained, used, or

controlled the use of the overpayment even after demand for return of the overpayment was

made.  Existing Connecticut case law supports 3N's conversion claim.  *Rana v. Terdjanian*, 136

Conn. App. 99, 46 A.3d 175 (2012); *Maroun v. Tarro*, 35 Conn. App. 391, 646 A.2d 251 (1994);

*Horelik v. Roth*, 15 Conn. App. 649, 545 A.2d 1167 (1988).

In the case of *Rana v. Terdjanian*, 136 Conn. App. 99, 46 A.3d 175 (2012), the

Connecticut Appellate Court was faced with facts that are strikingly similar to the facts in this

case.  *Rana* involved the transfer of funds due to a mistake made by the plaintiff.  Proceeds from

credit card payments that should have been deposited into the plaintiff's auto repair business

account were deposited into the business account of the defendant – the former owner of the auto

repair business.  136 Conn. App. at 103.  The deposits into the defendant's account were caused

by the plaintiff's mistake in completing paperwork for a new credit processing service. *Id.* The

deposits were not discovered by the plaintiff for nearly a year. *Id.* at 104. After discovering the

deposits, the plaintiff's agent contacted the defendant seeking the return of the payments. *Id.*

The defendant would not agree to return the funds. *Id.*

In analyzing the conversion claim, the Appellate Court affirmed the trial court's holding

that the defendant had personally committed conversion and was not shielded from liability by

his limited liability company. In so doing, the Appellate Court reasoned that

> [a]lthough . . . the defendant's initial possession of the funds at issue was not
> wrongful . . . the defendant's continued possession after [the plaintiff] provided
> him with documentation establishing that the funds had been deposited into his
> business' bank account in error was wrongful and amounted to an unauthorized
> possession of those funds.

*Rana,* 136 Conn. App. at 121.

In the present case, the evidence established that 3N voluntarily made the overpayment to

VJC. There was no evidence that VJC induced 3N to overpay the Invoice. Therefore, as was

true in *Rana,* VJC's possession of the overpayment was *initially* authorized. *Id.* However,

VJC's authorized possession of the overpayment ended when 3N demanded its return. Under

Connecticut law, the continued withholding of and failure to return the overpayment constitutes

conversion. *Id.* Based upon those facts and the application of the law, a judgment of conversion

was entered against VJC in the State Court Action.

However, a judgment of conversion was not entered against Carrano in the State Court

Action. In support of its claim that Carrano should also be held liable for conversion, 3N called

Franz to testify about Carrano's personal involvement with the overpayment. Franz testified that

he has a conversation with Carrano about the overpayment following the demand for its return.

According to the testimony of Franz, Carrano stated that "he held on to the money for as long as

he could, but if he hadn't spent it when he did, the business would be out of business." Franz's

testimony was subject to cross examination and rebuttal. Despite having the opportunity to do

so, Carrano did not contest, discredit, or in any way refute Franz's testimony regarding their

conversation.

Franz's testimony was further bolstered by Carrano's own testimony and documents

introduced into evidence at trial. The VJC Checking Account statements established that the

overpayment was deposited into the VJC Checking Account on July 9, 2010. Carrano testified

that on July 16, 2010, less than a week after the overpayment was deposited into the VJC

Checking Account, $81,000.00 was transferred out of the VJC Checking Account and deposited

into the newly opened VJC Savings Account. The evidence also established that at least

$40,000.00 was wire-transferred out of the VJC Saving Account to purchase two Ryder trucks.

Carrano testified that the Ryder trucks were going to be used by Carrano Transportation LLC.

Furthermore, less than a week after 3N demanded return of the overpayment, the evidence

established that the monies used to purchase the two Ryder trucks were refunded and deposited

into the Carrano Transportation LLC account. The refund was then used to pay ongoing

business expenses of the Carrano entities.

The evidence demonstrates that Carrano was personally aware that VJC had received the

overpayment and that he personally directed or authorized that the funds be spent for the benefit

of the other Carrano entities. As the Appellate Court noted in *Rana*, after receiving notice that

neither he nor his LLC was authorized to retain the overpayment, "it was wholly within the

defendant's power to return the misdirected funds to the plaintiff and he wrongfully chose not to

do so." *Rana*, 136 Conn. App. at 119-120. Despite demand, Carrano nonetheless wrongfully

chose not to return the overpayment, deciding instead to use the funds to keep his businesses viable.

The Court concludes that 3N has proven by a preponderance of the evidence that Carrano was personally involved in the conversion of the overpayment.

### b.  Statutory Theft

Count One also alleges that Carrano committed statutory theft. The Connecticut Supreme Court has explained that "[c]onversion can be distinguished from statutory theft ... in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." *Deming v. Nationwide Mutual Ins. Co.*, 279 Conn. 745, 771, 905 A.2d 623, 640 (2006); *see also In re Bolin & Co., LLC*, 437 B.R. at 752 (citing to *Deming*). The applicable standard of proof for a claim of statutory theft "is the preponderance of the evidence." *Stuart v. Stuart*, 297 Conn. 26, 42-44, 996 A.2d 259, 269-70 (2010).

Statutory theft under Conn. Gen. Stat. § 52-564 is synonymous with larceny under Conn. Gen. Stat. § 53a-119. *Deming v. Nationwide Mutual Ins. Co.*, 279 Conn. 745, 771, 905 A.2d 623, 640 (2006). A person commits larceny when, "with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or [withholds] such property from an owner." *Deming*, 279 Conn. at 771 (Internal quotation marks omitted). Conn. Gen. Stat. § 53a-119 also permits a finding of larceny on the basis of an embezzlement. *See, Sullivan v. Thorndike*, 104 Conn. App. 297, 306, 934 A.2d 827, 835 (2007). The statute provides that "[a] person commits embezzlement when he wrongfully appropriates to himself or

to another property of another in his care or custody." Conn. Gen. Stat. § 53a-119; *see also Fenn v. Yale Univ.*, No. CIV.A. 396CV(CFD), 2005 WL 327138, at *1 (D. Conn. Feb. 8, 2005).

In *Sullivan v. Thorndike*, the Connecticut Appellate Court addressed the issue of larceny based on embezzlement under Conn. Gen. Stat. § 53a-119. *Sullivan* concerned the appeal of a trial court decision dismissing, in relevant part, the plaintiff's embezzlement claim. *Sullivan*, 104 Conn. App. at 298-300. The plaintiff in *Sullivan* had entered into an oral agreement with the defendant to form a limited liability company which would buy and sell real estate. *Id.* at 299. The defendant subsequently formed an LLC, but did not include the plaintiff as a member. *Id.* at 300. The LLC purchased three properties using funds contributed by both the plaintiff and defendant. The three properties were subsequently sold, but the plaintiff did not receive any of the profits from the sale of the properties. *Id.* The plaintiff later brought suit against the defendant asserting claims for breach of contract and embezzlement arising from the failure to form an LLC with both the parties as members. *Id.*

Affirming in part the trial court's dismissal of both claims, *Sullivan* held that the plaintiff had failed to make out a prima facie case for embezzlement under Conn. Gen. Stat. § 53a-119. Although the Appellate Court found that the plaintiff had proven some elements of its claim, it reasoned that "the plaintiff's embezzlement . . . claim must fail" because he had not produced any evidence indicating either a legal right or possessory interest in the moneys he claimed to have been deprived of. *Sullivan*, 104 Conn. App. at 308.

Although an unreported decision, the case of *Fenn v. Yale Univ.*, No. CIV.A. 396CV(CFD), 2005 WL 327138, at *1 (D. Conn. Feb. 8, 2005), also provides guidance on a claim for larceny based on embezzlement. The plaintiff in *Fenn* was an inventor and former chemistry professor at Yale University. 2005 WL 327138, at *1. The case involved an

invention and a patent obtained by the plaintiff for that invention. *Id.* A dispute arose and the

plaintiff then sued the defendant. The defendant counterclaimed, alleging *inter alia*, that the

actions of the plaintiff in obtaining the patent could be classified either as embezzlement or an

appropriation by false pretenses, making him liable to the defendant for larceny and civil theft.

*Id.* The court in *Fenn* found in favor of the defendant on its counterclaim, ruling that the plaintiff

had committed larceny by embezzlement as defined by Conn. Gen. Stat. § 53a-119a and that the

embezzlement constituted a statutory theft under Conn. Gen. Stat. § 52-564.

Applying the statutory language and case law, the Court concludes that Carrano is

personally liable for the statutory theft of the overpayment. The evidence established Carrano

embezzled the overpayment, resulting in statutory theft of the overpayment. As noted above,

Franz testified Carrano stated that he held on to the money for as long as he could to keep his

businesses afloat. Carrano did not rebut or discredit this testimony. The evidence also

established that when Carrano directed the overpayment to be spent, he did so with intent and

that such intent was wrongful. Carrano admitted during testimony that he used the overpayment

to pay the ongoing expenses of the Carrano entities. Unlike the facts in *Sullivan*, 3N produced

sufficient evidence that it had a continuing ownership and possessory interest in the

overpayment.

The evidence demonstrates that Carrano personally and wrongfully directed the

appropriation of the overpayment. Carrano is therefore personally liable for larceny by

embezzlement and statutory theft of the overpayment. 3N has carried its burden on the issue by

a preponderance of the evidence.

### 2.  Count Two – CUTPA

3N also alleges that the failure to return the overpayment constitutes an unfair or

deceptive act or trade practice and Carrano should be held personally liable under CUTPA.

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-

110b(a). "[T]o prevail on a CUTPA claim, the plaintiff must prove that (1) the defendant

engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2)

each class member claiming entitlement to relief under CUTPA has suffered an ascertainable

loss of money or property as a result of the defendant's acts or practices." *Neighborhood*

*Builders, Inc. v. Madison*, 294 Conn. 651, 657, 986 A.2d 278, 285 (2010).

When determining if an act or practice is "unfair" for purposes of CUTPA, courts look to

the following factors:

> (1) whether the practice, without necessarily having been previously considered unlawful,
> offends public policy as it has been established by statutes, the common law or
> otherwise—in other words, it is within at least the penumbra of some common law,
> statutory, or other established concept of unfairness; (2) whether it is immoral, unethical,
> oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . All
> three criteria do not need to be satisfied to support a finding of unfairness.

*Harris v. Bradley Mem'l Hosp. and Health Ctr., Inc.,* 296 Conn. 315, 350, 994 A.2d 153, 173

(2010). An act or practice is "deceptive" for purposes of CUTPA if three requirements are met.

"First, there must be a representation, omission, or other practice likely to mislead consumers.

Second, the consumers must interpret the message reasonably under the circumstances. Third,

the misleading representation, omission, or practice must be material—that is, likely to affect

consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 215 Conn. 590, 594, 577 A.2d 1009,

1013 (1990), *cert. denied*, 498 U.S. 1088 (1991).

Having already concluded that Carrano is liable for both conversion and statutory theft,

as the Connecticut Appellate Court held in *Rana*, a violation of Connecticut statutes "by any

standard qualif[y] as 'immoral, unethical, oppressive and unscrupulous.' " *Rana*, 136 Conn.

App. at 123 (original brackets omitted). Accordingly, the Court concludes that 3N has met its burden by a preponderance of the evidence and Carrano is individually liable on the CUTPA claim.

### 3. Count Three – Piercing the Corporate Veil

Count Three asserts that VJC's corporate veil should be pierced and Carrano should be held liable for VJC's debts. In support of this claim, 3N alleges that Carrano had complete control over the finances, policies, and business practices of VJC and the other Carrano entities, and that the Carrano entities had no separate mind, will or existence of their own.

In Connecticut, piercing the corporate veil is "an equitable determination allowing for the enforcement of a judgment against a party not primarily liable." *Everspeed Enter. LTD v. Skaarup Shipping*, 754 F. Supp. 2d 395, 403 (D. Conn. 2010); *see also CSX Transp., Inc. v. Blakeslee*, No. 3:11-CV-533, 2012 WL 3985169, at *5 (D. Conn. Sept. 11, 2012). Circumstances under which the corporate veil may be pierced occur when the corporation is controlled and dominated in a manner that requires liability to be imposed on the real actor. *Naples v. Keystone Bldg. and Dev. Corp.*, 295 Conn. 214, 231, 990 A.2d 326 (2010). The corporate veil is pierced "only under exceptional circumstances . . . where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Id.* at 233; *see also, In re Carterhouse, Inc.*, 94 B.R. 271, 276 (Bankr. D. Conn. 1988). "The key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the entity sought to be held liable over corporate affairs." *Carterhouse*, 94 B.R. at 276. Piercing the corporate veil is a theory of liability only used in the most egregious cases because of its direct "opposition to the public

policy of the state . . . concerning the formation and regulation of corporations." *Naples*, 295

Conn. at 233-34.

     In *Naples*, the Connecticut Supreme Court held that the requirements of the

instrumentality rule or the identity rule must be met to pierce the corporate veil. The Court

described the rules as follows:

> The instrumentality rule requires, in any case but an express agency, proof of three
> elements: (1) Control, not mere majority or complete stock control, but complete
> domination, not only of finances but of policy and business practice in respect to the
> transaction attacked so that the corporate entity as to this transaction had at the time
> no separate mind, will or existence of its own; (2) that such control must have been
> used by the defendant to commit fraud or wrong, to perpetrate the violation of a
> statutory or other positive legal duty, or a dishonest or unjust act in contravention of
> [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must
> proximately cause the injury or unjust loss complained of....

> The identity rule has been stated as follows: If [the] plaintiff can show that there was
> such a unity of interest and ownership that the independence of the corporations had
> in effect ceased or had never begun, an adherence to the fiction of separate identity
> would serve only to defeat justice and equity by permitting the economic entity to
> escape liability arising out of an operation conducted by one corporation for the
> benefit of the whole enterprise.

*Naples*, 295 Conn. at 232 (quoting *Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.*, 187

Conn. 544, 552–54, 447 A.2d 406 (1982)).

     The requirements of both rules need not be proven to pierce the corporate veil. "A court

may properly disregard a corporate entity if the elements of *either* the instrumentality rule or

identity rule are satisfied." *Litchfield Asset Mgmt. Corp. v. Howell*, 70 Conn. App. 133, 148

n.11, 799 A.2d 298, 310 (2002) (citing to *Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.*,

187 Conn. 544, 553, 447 A.2d 406) (italics in original); *Saphir v. Neustadt*, 177 Conn. 191, 209-

10, 413 A.2d 843 (1979), *Zaist v. Olson*, 154 Conn. 563, 578, 227 A.2d 552 (1967)), *overruled

on other grounds by Robinson v. Coughlin*, 266 Conn. 1, 9, 830 A.2d 1114 (2003).

Turning first to the instrumentality rule, the evidence supports the conclusion that the first element, complete domination and control *in respect to the transaction attacked,* has been satisfied. Although certain evidence indicated that VJC employees had the authority to make some decisions on VJC's behalf, the uncontroverted evidence regarding the handling of the overpayment instead showed Carrano's complete control and domination of the entire corporate decision making process. The evidence established that Carrano told Franz that he not only knew about the overpayment, but that he personally directed its retention. Carrano admitted he personally made the decision to spend the overpayment to save "his business." The use of almost half of the overpayment to benefit the other Carrano entities is further support of the claim that Carrano completely dominated the handling of the overpayment and that VJC had no separate will or mind with regard to the overpayment.

3N also introduced evidence of the lack of corporate formalities observed by VJC, both generally and in handling the overpayment at issue. Carrano admitted at trial that "money was flying everywhere" between and among the Carrano entities. The evidence also established that no process existed to reconcile incoming checks against invoices. Further, the evidence established that almost half of the overpayment received by VJC was used to purchase trucks for Carrano Transportation LLC. When the payment for those trucks was refunded, the refund was deposited into the Carrano Transportation LLC Account. Carrano testified that although he knew demand for return of the overpayment had been made prior to the receipt of the refund, the refund was spent to pay "business expenses" of the Carrano entities. The lack of corporate formalities further supports a finding of complete domination and control by Carrano.

The second and third elements of the instrumentality rule are also satisfied under the circumstances. Carrano has been found liable for both conversion and statutory theft of the

overpayment, which was not returned to 3N and directly and proximately caused 3N's harm. The

instrumentality rule being satisfied, the Court will disregard the corporate shield of VJC and

impute its liability to Carrano personally.

### 4. Nondischargeability under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6)

Because Carrano has been found personally liable for failure to return the overpayment,

the Court will now address 3N's nondischargeability claims in Counts Four, Five, and Six of the

Complaint. As is true in all nondischargeability actions brought under Section 523(a), 3N bears

the burden of establishing the elements of each claim by a preponderance of the evidence.

*Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L. Ed.2d 755 (1991).

### a.      Count Four – 11 U.S.C. § 523(a)(2)(A)

Count Four alleges that the overpayment was obtained by false pretenses and actual

fraud. In relevant part, Section 523(a)(2)(A) excepts from discharge those debts obtained

through "false pretenses . . . or actual fraud." 11 U.S.C. § 523(a)(2)(A). "False pretenses

involve a misrepresentation *implied* from purposeful conduct intended to create a false

impression." *Peregrine Falcons Jet Team, A Nevada Corp. v. Miller (In re Miller),* 282 B.R.

569, 575 (Bankr. D. Conn. 2002) (emphasis in original). An implication of false pretenses arises

when a debtor, with the intention to mislead a creditor, engages in "'a series of events, activities

or communications which, when considered collectively, create a false and misleading set of

circumstances, . . . or understanding of a transaction, by which [the] creditor is wrongfully

induced by [the] debtor to transfer property or extend credit. . . .'" *Conn. Title Ins. Co. v.*

*Budnick (In re Budnick),* 469 B.R. 158, 174 (Bankr. D. Conn. 2012) (quoting *Mem'l Hosp. v.*

*Sarama (In re Sarama),* 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996)). Alternatively, "'[a]ctual

fraud' is any intentional deceit, artifice, trick, or design used to circumvent and cheat another, *i.e.*

overpayment, which was not returned to 3N and directly and proximately caused 3N's harm. The

instrumentality rule being satisfied, the Court will disregard the corporate shield of VJC and

impute its liability to Carrano personally.

### 4. Nondischargeability under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6)

Because Carrano has been found personally liable for failure to return the overpayment,

the Court will now address 3N's nondischargeability claims in Counts Four, Five, and Six of the

Complaint.  As is true in all nondischargeability actions brought under Section 523(a), 3N bears

the burden of establishing the elements of each claim by a preponderance of the evidence.

*Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L. Ed.2d 755 (1991).

### a. Count Four – 11 U.S.C. § 523(a)(2)(A)

Count Four alleges that the overpayment was obtained by false pretenses and actual

fraud.  In relevant part, Section 523(a)(2)(A) excepts from discharge those debts obtained

through "false pretenses . . . or actual fraud."  11 U.S.C. § 523(a)(2)(A).  "False pretenses

involve a misrepresentation *implied* from purposeful conduct intended to create a false

impression."  *Peregrine Falcons Jet Team, A Nevada Corp. v. Miller (In re Miller),* 282 B.R.

569, 575 (Bankr. D. Conn. 2002) (emphasis in original).  An implication of false pretenses arises

when a debtor, with the intention to mislead a creditor, engages in "'a series of events, activities

or communications which, when considered collectively, create a false and misleading set of

circumstances, . . . or understanding of a transaction, by which [the] creditor is wrongfully

induced by [the] debtor to transfer property or extend credit. . . .'"  *Conn. Title Ins. Co. v.*

*Budnick (In re Budnick),* 469 B.R. 158, 174 (Bankr. D. Conn. 2012) (quoting *Mem'l Hosp. v.*

*Sarama (In re Sarama),* 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996)).  Alternatively, "'[a]ctual

fraud' is any intentional deceit, artifice, trick, or design used to circumvent and cheat another, *i.e.*

something said, done, or omitted with the design of perpetrating what is known by the debtor to be a deception." *In re Miller*, 282 B.R. at 575.

3N failed to prove that the overpayment was obtained through false pretenses or actual fraud. False pretenses was not proven because there is no evidence in the record to suggest that Carrano or the Carrano entities mislead 3N or engaged in any events, activities, or communications to induce 3N to make the overpayment. Additionally, actual fraud was not proven because 3N did not put forth any evidence to show that Carrano or the Carrano entities deceived 3N to make the overpayment through intentional "deceit, artifice, trick or design used to circumvent and cheat another." *In re Budnick*, 469 B.R. at 174 (quoting *May v. Lyon (In re Lyon)*, 348 B.R. 9, 22 (Bankr. D. Conn. 2006)). Instead, the evidence established that the overpayment was initially authorized by 3N. No evidence was introduced to establish that the overpayment was made because of any implied or purposeful conduct or false impression or deception by Carrano or the Carrano entities.

Therefore, the Plaintiff has failed to show by a preponderance of the evidence that the debt to 3N should be deemed nondischargeable under Section 523(a)(2)(A).

### b. Count Five – 11 U.S.C. § 523(a)(4)

Count Five alleges that the overpayment was obtained by embezzlement and/or larceny. Section 523(a)(4) provides in relevant part that a debt will not be discharged when such debt was obtained through "embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

Section 523(a)(4) embezzlement is determined based on federal common law. In Connecticut, federal common law embezzlement has repeatedly been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Conn. Attorneys Title Insurance Co. v. Budnick (In re Budnick)*,

469 B.R. 158, 176 (Bankr. D. Conn. 2012) (citing *In re Rivera,* 217 B.R. 379, 385 (Bankr. D. Conn. 1998)). In order "[t]o prove embezzlement, the creditor must show by a preponderance of the evidence (1) that the debtor appropriated the subject funds for his own benefit and (2) that he did so with fraudulent intent or deceit." *In re Budnick,* 469 B.R. at 176 (quoting *Pierce v. Pyritz,* 200 B.R. 203, 205 (N.D.Ill.1996)). Further, "[f]raudulent intent may be determined from the facts and circumstances surrounding the act." *In re Budnick,* 469 B.R. at 176 (quoting *Estate of Stanford Harris v. Dawley (In re Dawley),* 312 B.R. 765, 779 (Bankr. E.D.Pa. 2004), *aff'd,* 2005 WL 2396489 (E.D.Pa. Sept. 28, 2005) (internal quotation marks omitted)).

3N has shown by a preponderance of the evidence that Carrano embezzled the overpayment. First, 3N established that Carrano appropriated the funds from the overpayment for his benefit. Although the original receipt of the overpayment was authorized, the retention and use of the overpayment for the benefit of the Carrano entities benefitted Carrano personally. Use of the overpayment allowed Carrano to keep his businesses operating when he admittedly would not have been otherwise able to do so. Furthermore, 3N established that retention of the overpayment was done with fraudulent intent or deceit. Carrano failed to contest or in any way refute Franz's testimony that Carrano held on to the money for as long as he could. It is therefore appropriate to conclude that Carrano decided to retain the overpayment for his benefit.

Based on the facts and the applicable law, the Plaintiff has proven by a preponderance of the evidence that the debt Carrano owes to 3N be deemed nondischargeable under 523(a)(4).

### c. Count Six – 11 U.S.C. §523(a)(6)

Count Six alleges that 3N suffered a willful and malicious injury when the overpayment was not returned. Section 523(a)(6) provides that a debt will not be discharged if such debt was obtained by "willful and malicious injury by the debtor to another entity or to the property of

another entity." 11 U.S.C. § 523(a)(6). A finding of nondischargeability under Section

523(a)(6) requires that the injury be both willful and malicious. *Parris v. Delaney (In re*

*Delaney)*, 504 B.R. 738, 749 (Bankr. D. Conn. 2014). Each element is analyzed below.

### Willful Injury

The ruling of the United States Supreme Court in *Kawaauhau v. Geiger,* 523 U.S. 57,

118 S.Ct. 974, 140 L.Ed.2d 90 (1998), addressing nondischargeability under Section 523(a)(6)

held that

> [t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that
> nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or
> intentional *act* that leads to injury. . . .
>
> [A] more encompassing interpretation could place within the excepted category a wide
> range of situations in which an act is intentional, but injury is unintended . . . A knowing
> breach of contract could also qualify. A construction so broad would be incompatible
> with the well-known guide that exceptions to discharge should be confined to those
> plainly expressed.

*Kawaauhau v. Geiger,* 523 U.S. 57, 61–64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in

original; citations and internal quotation marks omitted).

As previously discussed in the statutory theft analysis, Carrano's retention of the

overpayment resulted in him committing the intentional tort of statutory theft. *Automated*

*Salvage Transport, Inc. v. Swirsky (In re Swirsky)*, 372 B.R. 551, 563 (Bankr. D. Conn. 2006).

In this case, the evidence established that Carrano deliberately and intentionally injured 3N.

Carrano's statement to Franz that he held on to the money for as long as he could, and the

evidence that Carrano used the money to keep the Carrano entities operating, establishes the

deliberate and intentional nature of Carrano's actions in failing to return the overpayment.

Failing to return the overpayment caused 3N's injuries, including the loss of overpayment and

costs it incurred to attempt to collect the overpayment. Accordingly, 3N has satisfied the willful

injury element of a nondischargeability action under Section 523(a)(6).

### Malicious Injury

Under Section 523(a)(6), the plaintiff must also establish that the injury was committed

maliciously. The United States Court of Appeals for the Second Circuit has defined and

interpreted "malicious" as meaning "wrongful and without just cause or excuse, even in the

absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94

F.3d 84, 88 (2d Cir. 1996). Further, the Second Circuit found that malice could be constructive

or implied. *Id.* However, where a debtor seeks profit or some other benefit, "the underlying

conduct, however deplorable, would not give rise to liability under Section 523(a)(6) in the

absence of some additional, aggravating conduct on the part of the debtor of sufficient gravity to

warrant an inference of actual malice under the Second Circuit decision in [*Stelluti* ]." *Syncom*

*Indus., Inc. v. Wood (In re Wood)*, 488 B.R. 265, 279-80 (Bankr. D. Conn. 2013) (quoting

*Novartis Corp. v. Luppino (In re Luppino),* 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998)).

Based on the Second Circuit's interpretation of "malicious", Carrano's failure to return

the overpayment and use the money for business operations was "wrongful and without just

cause or excuse." Although Carrano explained to Franz that using the money allowed his

businesses to stay viable, maintaining his failing businesses at the expense of 3N losing the use

of the overpayment does not constitute just cause or excuse. Therefore, 3N has satisfied its

burden by a preponderance of the evidence that the injury was malicious.

Additional support of a finding of malicious injury under Section 523(a)(6) is contained

in the Memorandum of Decision issued in the State Court Action. Because 3N's claim for veil

piercing has been proven before this Court, Carrano is personally liable for the debts of the

Carrano entities, including the judgment debt entered against the Carrano entities. In support of

its judgment entered against the Carrano entities, the Superior Court held that "the egregious

nature of the defendant's [sic] conduct, are sufficient to support the plaintiff's claim for treble

damages." Further, the Superior Court held "that the defendants' egregious conduct . . .

constitute[d] an unfair act in the course of trade carried out with the defendants' intentional and

wanton violation of the plaintiff's rights." The findings of such egregious conduct in the State

Court Action also weighs in favor of a finding that Carrano's acts constituted willful and

malicious injury to 3N.

Therefore, the Plaintiff has satisfied its burden by a preponderance of the evidence for a

finding of nondischargeability under Section 523(a)(6).

## IV.   CONCLUSION

For the reasons set forth above, judgment will enter in favor of 3N on Counts One,

Two, Three, Five, and Six of the Complaint and judgment will enter in favor of Carrano on Court

Four of the Complaint. This Court does not need to determine the amount of 3N's debt as the

amount has already been determined in the State Court Action.

By the Court,

Dated: April 23, 2015

Julie A. Manning
Chief United States Bankruptcy Judge